Mr. Sandick, you've reserved two minutes for rebuttal, so that gives you eight out of the gate. You may proceed. Thank you very much, Your Honor. Good morning. May it please the Court. My name is Harry Sandick. I'm from Patterson, Delknap, Webb & Tyler, and I represent Darnell Kidd pursuant to an appointment by this Court under the Criminal Justice Act. In this case, the two key government witnesses testified at trial that my client, Darnell Kidd, participated in a robbery and homicide in White Plains in 2011. But in 2011, shortly after the homicide, police detectives who were in charge of the investigation in White Plains interviewed the two key witnesses, Karen Johnson and Della Cruz, and wrote reports stating that each of them in their interviews accused a third man, Mark Jones, of committing the crimes and clearing my client, Darnell Kidd, of those crimes. And the trial jury in this case never saw those official police reports. The district court excluded them after the detectives testified in a proceeding outside of the jury's presence that their own police reports were intentionally false and that neither witness, in fact, accused my client – I'm sorry, that neither witness, in fact, accused Jones of committing the robbery and homicide. But in – But the district court judge made that conclusion, at least with respect to the first witness, after viewing a videotape that, in effect, corroborated what the officer had said. What the officer said at trial? Well, the videotape – in the videotape, Kidd was identified. Is that not correct? So there's a videotape of one of the witnesses, Scandia Della Cruz. Right. And Della Cruz says different things at different points in that interview sequence. He says the exact opposite. At one point, he says that the one who remained behind and did not go on the mission that turned out to be a murder was the one in the dark hoodie. And at another time, he said it was the one in the baseball cap. That's right. So he said the witness in that video, in the actual interview, said two different things. So the officer's report credited him as having said that the black hoodie went on the murder mission. But he did say that, and he also said that it was Kidd who went on the murder mission. So Della Cruz said, early in the interview, said things – I think she referred to Kidd as Jules, which I'm not actually sure was Kidd's nickname. But putting that aside, it's clear she was referring early in the interview, talking about Kidd. Jules. And then at the end of the interview, when she was finally shown the photographs – and I will concede, what happened in that video interview is very tough to follow. I've watched it multiple times, because the detective doesn't kind of mark for the record the photos as he's showing them, and he's standing in a way – I'm not suggesting – You can't see the photos. Right. But at the very end – and I'm looking at – this is Exhibit 1100-GT. At the very end, the detective says, you're certain, you're sure, okay, that this is the person who was sitting on the bench with you. Della Cruz says, yeah, I think so, I think so. And then the detective says, okay, it's clear that he has a baseball hat on. And so at the end of the interview, at least, it seems that where they land – I'm not disputing that earlier in the interview there are definitely references to Kidd. But where they land at the end of the interview seems to be pointing that it was Jones who went down the block, and that Kidd is the person who stayed on the bench, because – But earlier in the interview, he says very clearly, two or three times, the opposite, that it was the black footy who remained on the bench. That's right. And so here, on a conditional relevance type of decision by the court, shouldn't the debate that we had with the government in the briefs and the discussion that Your Honor and I are having now, shouldn't that have been in the jury room? But what difference does it make what the detective wrote in the report about what the witness said in the interview when the jury has the – has access to the interview itself – to the interview itself? The jury can see firsthand what the – what Scandia – what Scandia – what she said in that interview. So – So what – how does it help things that the juror would also be able to see what the police officer wrote in his report about what she said, and they see exactly what Scandia said? Well, it's because of the ambiguity in the way the interview reads, and the uncertainty about where it lands. I think, from my reading – and the trial counsel thought the same thing – that where it lands is that Kidd stayed on the bench. We also have a second report written by another detective just a few days after the homicide in which that detective also reports that the other witness, Karen Johnson, implicated Jones not Kidd as being the second participant. And during the deliberations in this case, for whatever that's worth, they asked for a readback of Karen Johnson's testimony. If the jury had known that in an interview conducted 10 years before – before years of – to be – you know, I don't mean to be harsh, but years of cocaine abuse by Karen Johnson, which he testified about at trial, if they had known that an agent sworn to uphold the law wrote a report saying that it was not Kidd but Jones who went down the block, that would have been significant to the jury's deliberations. We all consider this is hearsay. What exception do you think takes this stuff in? So, we – I'm sorry. 807 requires reliability. And you got – you have pharmaphasia indicia of unreliability here, don't you? Well, Your Honor, it is true that 807 requires reliability. We, of course, agree with that. It just requires more than reliability. It says it must – it must be more probative on the point for which it's offered than any other evidence that the proponent can obtain through reasonable efforts. Well, the proponent here could obtain the testimony of the – of the witness himself who was on the stand. And so why isn't that – why isn't the testimony of the witness himself better evidence of what the witness said better than – than what an officer wrote in his report, the hearsay that an officer wrote in his report? So, it has to do with the fact that the report here was written shortly after the statement was made, shortly after the homicide was made, really just a few days or a couple of weeks. But the witnesses are disavowing it. I mean, that's what's unusual, right? I mean, usually you get a police officer up there and he says, I don't remember, I do so many of these things, you know, my practice is to put down the stuff that I hear and, you know, I think that's – that's what I would have done here. Well, here you have somebody who says, we did the opposite. I mean, it seems nutty, but it does seem – I mean, it's hard to argue that you meet the requirements for the 807 residual hearsay exception. Your Honor, it – two points in response. First, it is indeed shocking that officers who are supposed to be accurately recording what they see in their investigations, what they hear, are both coming into court and essentially disavowing their own reports. That is a shocking and unusual turn of events. We agree with you, but – So how do you get to it being particularly trustworthy? You still need a hearsay exception. So here's why the report is trustworthy. These are both very detailed reports, several pages long. They are 99 percent the same as what the witness said at trial, with the important exception of who did it. They were written very close in time to the taking of these statements. The reports each corroborate the other because, according to these reports, both witnesses are telling the detectives. The alternative is to believe that the detectives, in fact, deliberately wrote false reports that accused an innocent man, Mark Jones, of committing a murder. So the trustworthiness is that – Well, the detectives, they said that that was their theory. At the time, that was their theory of the case. It wasn't that they were – they didn't say we were accusing an innocent man. They said we thought it was Mark Jones, and our – what we wrote in the report was coded by that belief. That is, Your Honor, what they said at the trial or at the – you know, the hearing at the trial. But they never wrote that in their report. They never said in the report, we – you know, the witness said, kid, but we really think Jones. This is a situation where also the reports are not at odds with the testimony at trial on any other point except for the crucial question of who did it. So you have very detailed reports. They corroborate each other. Both reports accuse Jones and not kid of being the second participant. They're written close in time to when the witnesses made these statements. The witnesses now at trial – you know, Dela Cruz admits that she used PCP, angel dust, for years, and she even said at trial she didn't have a firm memory of her statement that night or of what happened in the – on the day of the murder itself. Well, look, I'll – you are correct that there's a certain error, at least in my mind, of suspiciousness to the cop's explanation. But not to belabor the point, you still need a hearsay exemption. So, again, the hearsay rule here is Rule 807. And the trustworthiness, Your Honor, comes because these are detailed reports that are, with this one exception, they are fully corroborated by the testimony of the witnesses. They're written close in time to both the murder and to the – But you seem to be suggesting that they are reliable because nobody could believe other than that these officers are lying about the accuracy of these reports. I do think that that's part of it. And the conditional relevance analysis that the district court should be doing here is a very low standard. Dawkins says, could the jury reasonably find the conditional fact by a preponderance of the evidence? It's not hard for me, at least, to imagine that a jury could conclude here that the detectives were right in 2011 and wrong in 2022, and that this highly improbable story about detectives each writing reports from the two key witnesses, each accusing the jury, Jones and not Kidd. And the jury is kept from that exculpatory evidence. It was based on – it doesn't turn on – You don't contend, do you, that there's any evidence that the two witnesses, Scandia and Karen, had any motive to falsify at the time that they testified at the trial? They had no motive to falsify different in 2011 than in 2022. The difference is that, just to take Karen Johnson for a moment, he admits that up until shortly before the trial, he was a habitual user of crack cocaine, which common sense tells us impacts memory. Delacruz herself says, I don't really have a firm memory of everything that happened that day or everything that happened in the interview. And so in a circumstance such as that, where there is clearly exculpatory evidence, this is being kept from the jury, the defendant, based on the two immunized witnesses. They're not even subject to the usual arguments the government makes about cooperators, because all they were subject to was a potential charge of false statements in court. So this isn't like the normal cooperator where the government will say, look, if the defendant lies, they'll be hit very hard at their own sentencing. There is no sentencing. So it's a thin record. There's no forensic evidence. There's no other witness evidence besides these two people who one of them, by their own admission, has seriously impaired memory. It's tough to swallow that the detective statements are out there, were kept from the jury, and darn old kid is in jail until 2060. I see my time is up. It's way out. I'm sorry. We were asking you questions. You've been helpful the entire time. What did you say? You've been helpful. I appreciate that, Your Honor. Does the district court have any discretion with respect to 807? So I think the problem here, the short answer is the district court definitely has discretion on evidentiary rulings, and they're reviewed for an abuse of discretion. But here the district court never actually walked through any of the factors that this Court in hearing or its other Rule 807 cases talked about. The Court just said you haven't demonstrated any indicia of reliability. There were, in fact, some indicia of reliability for this police report, and then said, well, and also it's not admissible under 613B, which defeats the whole purpose of Rule 807. It's meant to be kind of an escape hatch when there is reliable evidence that does not fall within an existing rule. So the district court did not apply the right standard and, therefore, abused its discretion in that sense. You've got two minutes for rebuttal. Thank you, Your Honor. We'll now hear from Ms. Zarovich. I hope at some point in your argument you'll deal with the question whether the district court has discretion with respect to 807 considering the way it's written. Go ahead, Your Honor. Thank you, Your Honor. May it please the Court, Olga Zverevich for the United States. I represent the government on appeal, and I represented the government below. The judgment of the district court should be affirmed. With respect to the 2011 reports, the defendant's sole argument on appeal is that the district court abused its discretion in declining to admit these reports under the residual hearsay exception in Rule 807. An exception that this Court has described as very rarely used and that applies only in exceptional circumstances. Well, this was a stale, thin case. Would you agree that if a jury had the benefit of the knowledge of these statements, it could very well have mattered? No, Your Honor. I believe Your Honor is asking about the harmlessness, and we believe that a rational jury would not have – there is no likelihood that a rational jury would have reached a different verdict. No likelihood. Why? And that's because the record here, which is the hearing as well as the videotape of Ms. Dela Cruz's statement, proved that these reports were false and unreliable. Under the residual hearsay exception – How did the Scandia tape prove that the Caron report was unreliable? I agree with you. I agree with you with respect to the Scandia – the statement by Detective Martin about his interview of Scandia. We just don't – it doesn't add anything. Martin's report doesn't add anything when you have the video that he was commenting on. But we don't have that with respect to the Farron – Detective Farrelly's interview of Caron. That is correct, Your Honor. We do not have a videotape of the Caron interview. However, Detective Farrelly, who conducted that interview, testified at the Rule 104 hearing regarding that interview. And what he testified was several things. One is that he conducted this interview in a very unusual manner, which is he took no notes. He did not record the interview. He had no partner for the interview. He said he was trying to reconstruct Caron's vague descriptions after the fact. He said that he allowed, just like his practice was back then, he allowed his then theory of the case to, quote, color that specific report as well as other reports that he and Detective Martin wrote. Do you think a jury would believe that? We do, Your Honor, because it's corroborated by what happened with the Delacruz interview, which is, in the case of the Delacruz report, the videotape affirmatively proves that that report is flat-out false. And these were two detectives who were – No, it doesn't prove that it was flat-out false. To the contrary, because the videotape shows that Scandia said both things. Scandia said the one who remained behind was the one in the dark hoodie, and she said the one who remained behind was the one in the baseball cap, the defendant kid. So it doesn't prove that it was false. She said both things. And I don't think we can assume that the same was true of the other witness, Caron. We can't assume that Caron also said both things, mutually inconsistent things. Your Honor, and this is the point that I wanted to address Your Honor's question from Appellant's argument. We respectfully disagree, Your Honor. The district court found, to the contrary, watching the video, the district court found that Ms. Delacruz was consistent throughout that interview. That's corroborated by Delacruz's own testimony. All of those excerpts were admitted in evidence during her testimony. She testified that her identifications throughout that interview remained consistent. She said it's indisputable that she said several times that the one who remained behind was the one in the dark hoodie. That's correct, Your Honor. You can't dispute that. And that was her identification throughout, that the man in the black hoodie, which is Mark Jones, remained behind and did not commit the crime. And she also said that the one who remained behind was the one in the baseball cap. That's incorrect, Your Honor, respectfully. If you watch that segment. I watched it. In that segment of the interview, which is towards the end of the interview, she, Detective Martin, is showing her photographs. And he is, you can hear him testing her identification. He says, are you sure that this is the one? Are you sure this is the one? And she persists in that identification. She says, yes, I'm sure. Yes, I'm sure, several times on that video. You can't see in the video the photographs that she's being shown. And if you look at just the transcript of that segment, I can see how, and the defendant made this argument below, I can see how it can appear that she changes her identifications. But if you, I respectfully submit, and this is what the district court did, if you watch the segment side by side with the transcript, you see that she, in fact, does remain consistent. And that's what Detective Martin, who authored the report, testified at the hearing. He testified that she remained consistent. Ms. Delacruz testified. And how does that, whether we agree with you or not, how does that affect Farrelly's report about his interview of a different witness? Your Honor, we submit that it affects it in the sense that these were two detectives who were working together. Each of them testified at this hearing that they allowed their theory of the case to color their reports. And in the case of Delacruz, we have independent evidence of that, which is the videotape. So while we do not have that in the case of Koran-Johnson, we submit that that corroboration is relevant in assessing the Koran-Johnson report. And just to take a step back, Your Honor, the exception here contains extremely rigorous requirements, which is it was Mr. Kidd's burden to show that this evidence was particularly trustworthy, as well as that a war on the material fact was the most corroborative evidence of that material fact. All of these requirements were his burden to show. And what the Court is reviewing is whether the district court abused its discretion in finding to the contrary. And here — I'm just reminded, as Mr. Sandek pointed out, of the eight or nine points in this detective's summary or notes or whatever it's called, they were all correct except for this one, in both of them. What do you make of that? Two responses to that. One, Your Honor, is I'm not sure that there is an evidentiary basis to say that it's been consistent. One, for example, one inconsistency was pointed out in our brief with respect to the Koran-Johnson interview is that — Well, the overwhelming number of them were accurate, except for this, the one we're questioning you about. Your Honor, well, I think the response to that is, again, both detectives testified under oath that their theory in 2011 was that the man in the black hoodie committed this murder and that they allowed that personal theory to color their reports. And therefore, the central aspect of these reports, which is who did the murder, is the aspect that unfortunately became colored by that theory. You were about to say that there were other inaccuracies in the report. What were they? One inconsistency that we pointed out in the brief, Your Honor, is that the Koran-Johnson report describes the man in the black sweatshirt as having teardrop tattoos, and we believe that that's an inaccuracy because the evidence at trial showed that it was, in fact, the defendant who had teardrop tattoos back in 2011 and 2012. The report said that who had the teardrop tattoo? The man in the black sweatshirt. The man in the black hoodie had the teardrop tattoo? Correct. And Detective Farrelly testified that, again, because of this unusual circumstance, he had no notes, that Koran-Johnson gave vague descriptions. He was trying to piece things together as well as allowed his theory to color his reports. So on that record, the district court certainly was well within its discretion to conclude that these reports are untrustworthy and unreliable and that the defendant did not meet his burden of showing otherwise. Why are police officers creating untrustworthy, unreliable reports when they know that these kinds of documents are going to emerge if there's a trial prosecution? It is a good question. It is a good question. The record on this was not developed below. You've seen the testimony, which was that's what they believed at the time. They allowed their personal theory to color their reports, and that's what's in the record with respect to these two detectives. Well, I imagine they'll be impeached with that testimony if they ever take the stand again in other cases. But the threshold question here is whether the district court abused its discretion in concluding that the reports were not sufficiently reliable or particularly trustworthy. Correct, Your Honor. All right. Well, thank you. We will now hear from Mr. Sandin for two minutes, everybody. Oh, I'm sorry. I asked you to cover the question whether the district judge has discretion with respect to 807. Yes, Your Honor. It is reviewed. I think both parties agree it's reviewed for abuse of discretion. But the rule says the way the rule reads, that would be the normal thing, that there's a lot of discretion. But the rule says under the following conditions, the hearsay statement is not excluded by the rule against hearsay, even if the statement is not admissible under the hearsay exception, under those two conditions that we've been referring to. It doesn't sound like giving the district judge discretion. It says that there is no, that the statement is not excluded by the hearsay exception. Your Honor, the district court makes preliminary determinations, including as to whether a hearsay exception is satisfied under Rule 104A, applying a preponderance of the evidence standard, and those findings are reviewed for abuse of discretion. So the hearsay exception here has five different requirements, and the question is whether in finding those that the defendant did not meet his burden of satisfying those, the district court abuses discretion under Rule 104A. Thank you. Thank you. All right. Mr. Sandman. Thank you, Your Honor. So I just want to address a couple of points. So one, on the last subject of discussion about discretion under 807, what my interpretation of that language is to say that the district court can't deny an application under Rule 807, has no discretion to deny an application under Rule 807 based on the application of, let's say, Rule 803 or 804 or 801 or any of the hearsay rules. I don't know that it prevents the district court from looking at other circumstances. But what is troubling here is that in Shearing, this Court said there should be no per se rule to keep evidence out under 807. And I think what the district court did here is treated Rule 613B as essentially a per se rule that I can't let in under 807. The court does a 613B analysis, then says it's not reliable, then goes back to 613B and never goes through the factors that this Court in Shearing or in the other Rule 807 cases addresses. Well, wait. If it's not reliable, you still need to go through everything else? Well, I think the Court doesn't explore the question of reliability beyond just simply saying it's not reliable. They never — the Court never discusses the fact that the witness's testimony at trial is — Well, but the question is whether or not the district court abused its discretion in concluding that it's not reliable or particularly trustworthy on this record, right? Yes. And on this record — You're not saying that the district court has to sort of check boxes or say magic words, right? No. Magic words is never the right answer in an appeal, it seems. So I'm certainly not saying that. But what I am saying is that to make this case one governed by Almonte when there's an entirely different body of law, that's the abuse of discretion. And on the question of reliability, just going to a subject — sorry to step aside — going to a subject that was raised in the government's argument, and we talk about this on page 12 of our report that — I'm sorry, page 12 of our reply brief, where we talk about Detective Farrelly's report. The report describes the clothes that Kin and Jones wore in a way that's consistent with the trial testimony. It identifies the address where Johnson and Chambers first met at 225 Martin Luther King Boulevard. It identifies the names of even peripheral individuals like Jonathan Johnson, who's the victim. Jonathan Johnson's drug dealer. It quotes verbatim important snippets of conversation involving Chambers that Karen Johnson overheard that was later testified to at trial. And there are other points as well. And so to simply reject this unreliable police report that lines up with the trial testimony in every way but one, the most important one, to be sure. But it's not that simple, right? I mean, it's that you have two officers who explicitly disavow that point of the report, and then you have a video that basically corroborates, or at least arguably corroborates, their disavowal. Well, to take the last point, Your Honor, arguably corroborates and arguably contradicts. And that's something that the jury should have had before. Shearing says that the — But the court's playing a gatekeeping role on this. I mean, this is not — this is an exception. This is like the sort of last — last way in for an exhibit, right? Yes. For last — So it has to be particularly trustworthy. That's true. You're saying it's not necessarily untrustworthy, it seems to me. No. I think it's — I think a police — it's a strange circumstance for a defense counsel to make this argument. But a police report that is corroborated 99 percent by trial testimony is particularly trustworthy. And Shearing says that — But what you're saying, then, is that the district court should have disregarded the testimony of the officers themselves. No. The district court should have, consistent with the preliminary admissibility ruling, should have said, this is a close call, and a reasonable juror who heard the testimony that I heard from the detectives would have no trouble concluding that the detectives were telling the truth in their reports and are not telling the truth here, and let the jury decide. So it seems to me you're saying that the question is not whether it's particularly trustworthy. It's whether a reasonable juror might have found it trustworthy. The question for preliminary admissibility — and I'm just looking at the court standard in the Dawkins case from 2021. Right. The standard is low. It's whether the jury could reasonably find the conditional fact by a preponderance of the evidence. The judge is supposed to be a gatekeeper, but not a gatekeeper to keep out evidence that a jury could fairly accept as true. That's beyond the role of the judge as gatekeeper. He's then essentially doing summary judgment analysis or something else. And here, the district court held this to a higher standard than Rule 807 requires, looked to other rules that are not relevant to an 807 analysis. Shearing says there are four classic hearsay dangers, and that you consider insincerity, faulty perception, faulty memory, faulty narration. All of those support the admissibility of this document. And Shearing says that the Court doesn't need to conclude that the evidence is free of all risk of being incorrect. So on these facts, the evidence should have been admitted. I know my time's up again. All right. Thank you. Well, thank you both. Thank you. We will reserve decision. Thank you. All of you. And thank you also for being on the CJA panel.  Connect your phone. Yes, sir.